# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| In the Matter of: | **}** | |
| | } | |
| CIRO A. RODRIGUEZ | } | CASE NO. 19-81378-CRJ-7 |
| | } | |
| | } | |
| | } | |
| | } | |
| | } | CHAPTER 7 |
| Debtor(s). | } | |
| | | |
| SIGNAL ASSET MANAGEMENT, LLC | } | A.P. 19-80063-CRJ-7 |
| | } | |
| | } | |
| Plaintiff(s), | } | |
| v. | } | |
| | } | |
| | } | |
| CIRO A. RODRIGUEZ | } | |
| | } | |
| Defendant(s). | } | |

## MEMORANDUM OPINION

This Adversary Proceeding came before the Court on December 21, 2020 for trial on the Complaint for Determination of Dischargeability and Objecting to Debtor's Discharge Pursuant to Section 523 and 727 of the Bankruptcy Code (hereinafter the "Complaint") filed by Signal Asset Management, LLC (hereinafter the "Plaintiff") against Ciro A. Rodriguez (hereinafter the "Defendant"). The Plaintiff seeks a determination that the Defendant is liable for damages arising out of a construction contract and that the debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

At the conclusion of the trial, the Court entered an Order Requiring Post-Trial Briefs, directing the parties to address relevant Eleventh Circuit case law and how the testimony and the

evidence adduced at trial relates to the Plaintiff's cause of action under the Bankruptcy Code.[1]  On February 1, 2021, the parties filed their respective briefs.[2]

The Court has carefully considered the briefs, testimony, documentary evidence, the arguments of counsel, and the applicable law, and finds that the Plaintiff failed to prove by a preponderance of the evidence that its claim against the Defendant for damages should be excepted from discharge pursuant to § 523(a)(2)(A) as a debt for money obtained by "false pretenses, a false representation, or actual fraud . . ."[3]  Further, to the limited extent the Plaintiff requested denial of the Defendant's discharge as alternative relief in the Complaint, the Court finds that the Plaintiff failed to establish by a preponderance of the evidence adduced at trial that the Debtor's Chapter 7 discharge should be denied.   The Plaintiff has generally proceeded under § 523(a)(2)(A) of the Bankruptcy Code throughout the pendency of this Adversary Proceeding.   Further, in the Complaint the Plaintiff failed to even specify which subsection under § 727 might support denial of the Defendant's discharge.[4]   Accordingly, the Plaintiff's request under § 727, to the extent plead, is denied, and will not be further addressed in this Memorandum Opinion.

---

[1]      Order Requiring Post-Trial Briefs, ECF No. 143.

[2]      *See* Post-Trial Brief in Support of Plaintiff, ECF No. 146, and Post-Trial Brief filed by Defendant, Ciro A. Rodriguez, ECF No. 147.

[3]      11 U.S.C. § 523(a)(2)(A).

[4]      *See Harlander v. Turner (In re Turner)*, 2017 WL 1214410 (Bankr. S.D. Ga. 2017)(dismissing cause of action under § 727 where plaintiff failed to "even hazard a guess as to which grounds might support denial of discharge" and original complaint set forth no plausible basis for denial of discharge under § 727).

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[5]

## FINDINGS OF FACT

### A. Background and Procedural History

On May 23, 2017, the Plaintiff filed a Complaint against the Defendant and William Michael ("Michael") in the Circuit Court of Madison County, Alabama, 47-CV-2017-900875, alleging negligence, wantonness, breach of contract, breach of implied warranty of good workmanship, breach of express warranty, suppression, reckless misrepresentation, fraudulent misrepresentation, and innocent misrepresentation.[6]   On September 25, 2017, the Circuit Court of Madison County, Alabama, entered default judgment against the Defendant and Michael for $37,247.67 plus court costs. On September 16, 2019, the Plaintiff obtained $16,000.00 in a *pro tanto* settlement with Michael's estate, which was paid by his insurer after his death.[7]

On May 3, 2019, the Defendant filed his petition for relief under Chapter 7 of the Bankruptcy Code and listed the Plaintiff as an unsecured creditor.   On July 30, 2019, the Plaintiff commenced this Adversary Proceeding seeking to liquidate its claim against the Defendant and to except the debt from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

---

[5]   To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such.   Further, to the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

[6]   Defendant's Exhibit 33.

[7]   Defendant's Exhibit 34.

3

On June 11, 2020, the Defendant moved to dismiss the Adversary Proceeding, arguing that the Plaintiff was seeking damages in excess of previous amounts recovered pursuant to the *Pro Tanto Release* with Michael's estate.[8] On June 25, 2020, this Court entered an order limiting the amount of any recovery in this Adversary Proceeding to $21,247.67 based on the Plaintiff's recovery against Michael's estate ("Order Limiting Damages").[9]

## B. The Construction Contract

The Plaintiff is a Virginia limited liability company registered to conduct business in the State of Alabama. The Plaintiff is primarily engaged in the business of purchasing and remodeling homes for profit. Mark Paniccia is the Plaintiff's Managing Partner (hereinafter "Paniccia" or collectively the "Plaintiff"). In April of 2016, the Plaintiff purchased a home located in Huntsville, Alabama and hired the Defendant to renovate the property. Prior to purchasing the home, the Plaintiff had "flipped" twenty to twenty-five houses in other states.

The Plaintiff argues that the Defendant knowingly entered into a construction contract to perform $47,000.00 of construction work with knowledge that he could not obtain the required permits and certificate of occupancy to perform the work. The Plaintiff seeks to recover the money that it paid to another contractor to bring the house up to Code after the electrical service to the home was disrupted, plus per diem damages under the construction contract.

The Defendant is a subcontractor, licensed to perform roofing, carpeting, flooring, siding, painting, and other general repairs. The Defendant began subcontracting in Alabama in 2010 and

---

[8]     ECF No. 62.
[9]     Order Limiting Damages, ECF No. 73.

has operated under various entities, including C.A. Rodriguez Construction, LLC and Rodriguez Roofing Home Remodeling, LLC.

The Defendant is not, and has never been, licensed by the Alabama Homebuilders Licensure Board as home builder or licensed as a general contractor. The Defendant denies making any false representations to the Plaintiff. Rather, the Defendant asserts that he told the Plaintiff's Agent, who oversaw the renovations on behalf of the Plaintiff, that a licensed home builder would have to apply for the building permit. He further denies that either he or his employees removed the electric meter from the exterior of the home which caused the City of Huntsville to require both the interior and exterior electrical service to the home to be brought up to Code.

The Plaintiff and the Defendant were introduced to each other by the Karen Ruffin, an Associate Broker with Keller Williams Realty in Madison, Alabama. After showing him another house, Paniccia testified that Ms. Ruffin gave him a lead on a foreclosure listing at 6013 Meadow Winds Drive, NE, Huntsville, Alabama 35811 (hereinafter the "Meadow Winds Property" or "Property"). The Plaintiff purchased the Property on April 29, 2016 for $72,350.[10]

While the business relationship between the parties is not completely clear because Ms. Ruffin did not testify, it appears that she acted as the Plaintiff's agent or representative throughout renovation of the Property. The Plaintiff called Ms. Ruffin (hereinafter the "Plaintiff's Agent") as a witness during the trial which was held remotely using Microsoft Teams. After it became apparent that the Plaintiff's Agent was traveling and was unable to review any of the Exhibits that had been emailed to all witnesses for use during testimony, she reluctantly agreed to return to the

---

[10]     Plaintiff's Exhibit 20.

5

location where the Exhibits were located while the trial proceeded. Thereafter, the Plaintiff elected not to recall her as a witness.

It is undisputed, however, that the Plaintiff relied upon the Plaintiff's Agent to recommend a contractor to perform the renovations and to oversee the renovation of the Property. The Plaintiff's Agent emailed pictures of the Property to the Plaintiff as progress was made and was authorized to approve the work performed.

Before the Plaintiff closed on the Property, the Plaintiff's Agent solicited a bid from the Defendant, with whom she had worked before, to perform the renovations on behalf of the Plaintiff. It appears that Paniccia, who resides in Virginia, and the Defendant never actually met in person. Instead, they generally communicated via a stream of emails which flowed between the Plaintiff's Agent, Paniccia, and the Defendant's assistant, Maria Delacruz (hereinafter "Delacruz"). Paniccia testified that he did not know that the Defendant and the Plaintiff's Agent had previously worked together when he hired the Defendant. While he assumed that she would only recommend a licensed home builder or general contractor, Paniccia further admitted that the Plaintiff's Agent never actually told him that the Defendant was a general contractor. Paniccia affirmed that he would not have hired the Defendant had he known that the Defendant was not a licensed home builder or general contractor.

In April of 2016, the Defendant emailed a one-page proposal to the Plaintiff, detailed as follows: (i) Ruffin [sic]: Demo, Electric, Plumbing, Sheetrock - $17,000; (ii) Exterior: Tear off Siding, Install New Siding, Porch, Facial, Soffit, Gutters, Handrails, Paint - $12,650; (iii) Interior:

Floors, Showers, Paint, Cabinets, Hardwood, Carpet, - $12,650; and (iv) Final Punch: Touch up, Housekeeping, countertops - $4,700 (10% of Total Price, $47,000).[11]

Accustomed to receiving more detailed bids from contractors, the Plaintiff emailed a blank construction contract, which he had used in other renovation projects, to the Plaintiff's Agent for her to provide to the Defendant.[12] On April 12, 2016, the Plaintiff's Agent emailed the Defendant explaining that the Plaintiff needed to know whether the Defendant could perform the work because the Plaintiff wanted renovations to begin as soon as it closed on the Property.[13]

On April 14, 2016, the Defendant's assistant, Delacruz, emailed the signature page of the form construction contract, page five, back to the Plaintiff (hereinafter the "Contract") with the Defendant's signature on the line under the heading "Contractor".[14] Underneath the signature and title lines, the Contract contains a line for the Contractor's "License Number" which the Defendant left blank.[15]

The Contract included the following draw schedule: (i) first payment of $17,000 upon rough-in; (ii) second payment of $12,650.00 upon completion of exterior; (iii) third payment of $12,650.00 upon completion of interior; and (iv) the final Payment of $4,700.00 upon completion of entire job and getting permits for a total of $47,000.00.[16] The Contract was subsequently

---

[11]     Plaintiff's Exhibit 6.
[12]     Plaintiff's Exhibit 8.
[13]     Plaintiff's Exhibit 9.
[14]     Plaintiff's Exhibit 14.
[15]     *Id.*
[16]     Plaintiff's Exhibit 16.

modified by two changes orders which increased the scope of the work in exchange for an additional $1,900.00, bringing the total Contract price to $48,900.00.[17]

The change orders were summarized in an email dated May 5, 2016 sent by Paniccia to both the Plaintiff's Agent and the Defendant pursuant to which Paniccia states "If you all agree, you can print this email off, both sign it and send it back to me as a way of capturing all of our change orders to date to the contract dated April 14th: . . . Contractor agrees that draw #3 will not be delivered until exterior and interior, as revised above, have been 100% completed."[18] The Defendant signed the document in his capacity as the "Contractor" and the Plaintiff's Agent signed the document in her capacity as "Client Representative."[19]

The draw schedule was amended as follows to reflect the additional work: (i) first payment of $17,000 upon rough-in; (ii) second payment of $14,550.00 upon completion of exterior; (iii) third payment of $8,675 upon completion of added exterior items and interior; and (iv) the final payment of $8,960 upon completion of entire job and getting permits for a total of $49,185.[20]

The parties dispute whether the Contract contained five or six pages. The Defendant asserts that the original Contract did not include page six which outlines in detail the scope of work to be completed by the Defendant, including interior electrical work and plumbing in the bathrooms.[21] While the Plaintiff offered impeachment testimony from the Defendant's state court deposition pursuant to which the Plaintiff asserts that the Defendant admitted that the Contract included all

---

[17]     Plaintiff's Exhibit 22.
[18]     *Id.*
[19]     *Id.*
[20]     *Id.*
[21]     Plaintiff's Exhibit 16.

six pages, the Defendant offered additional pages from the deposition pursuant to which it appears that the Defendant denied same. During the trial, the Defendant explained that he misunderstood the question during the deposition because English is his second language. Indeed, the Defendant testified during the trial with the assistance of an interpreter upon whom he heavily relied and it was apparent that the Defendant is not fluent in English. Regardless, the Defendant admits that he and Cruz Electric performed electrical work in the interior of home, installing can lights, ceiling lights, and electrical outlets and that they did not have a permit to perform the electrical work.

Every iteration of the Contract admitted into evidence contains Article IX which requires the Defendant to adhere to "Standard Practices of the Trades" and to protect Plaintiff's "Project site from any damage resulting from the work of Contractor and shall repair and replace any damaged work at its own expense."[22] Article XI states that "Contractor will be responsible for obtaining the necessary permits, inspections and certificates of use and or occupancy, and licenses to fulfill the services specified in this Contract."[23] Article II of the Contract states that work was to begin on April 27, 2016 and to be completed by May 27, 2016, with time being of the essence. Article II further imposes a per diem of $100 to Contractor for unapproved delays greater than ten calendar days.[24]

It is undisputed that the Defendant knew that a building permit would have to be obtained to renovate the Property and that only a general contractor or licensed home builder could obtain the required building permit. It is further undisputed that the Defendant showed the Plaintiff's

---

[22] *Id.*
[23] *Id.*
[24] *Id.*

9

Agent his subcontractor's license when she asked to see his "license" before the work began. However, the Defendant testified that he explained to the Plaintiff's Agent that he was not licensed as a home builder and could not obtain a building permit to perform the renovations. Prior to executing the Contract, the Defendant maintains that the Plaintiff's Agent knew that another Michael had agreed to apply for the building permit and to meet with the City of Huntsville during inspections.

Randy Cunningham (hereinafter "Cunningham"), the Director of Inspections for the City of Huntsville and a member of the Board for the Alabama Home Builders Licensure Board (hereinafter "AHBLB"), testified that license "loaning" is illegal at both the state and local level and that Michael was cited and fined by the AHBLB for loaning his license to the Defendant to obtain the building permit for the Property.

**C. The Building Permit**

On May 9, 2016, Michael applied for and obtained a building permit from the City of Huntsville to perform the following renovations at the Meadow Winds Property - repair drywall patch, install pre-finished hardwood 450 square feet, 11 yards of carpet, ceramic tile 2 bathrooms, replace lap siding with hardie siding, paint interior and exterior of house.[25] The application submitted by Michael did not include any plumbing or electrical work in violation of City of Huntsville ordinances. During the trial, the Defendant testified that he did not know or understand when he entered into the Contract that a separate electrical permit was required to replace the light switches and ceiling fans.

---

[25] Plaintiff's Exhibit 24.

The building permit issued by the City of Huntsville Inspection Department listed Bill Michael Construction as the Contractor.[26]   It is undisputed that the building permit was clearly posted at the Property during the renovations.   According to the Defendant, the Plaintiff's Agent routinely visited the Property to oversee the renovations, generally at least once a day.

In the Complaint, the Plaintiff asserts that the Defendant entered into a contract with Michael to create a joint venture or partnership to renovate and remodel the Property. "The contract was made for and/or intended to bestow a direct benefit on Signal Asset Management, LLC by allowing Michael to serve as the licensed home builder or general contractor to obtain the required building permits and ensure the work performed at the residence was completed in accordance with the building code requirements and workmanship standards for the City of Huntsville."[27]

The Defendant testified that he offered to pay Michael ten percent of the Contract price to apply for the permit, but Michael refused payment and filed the application for the nominal amount of one penny as a favor to the Defendant.   Michael's involvement was limited to applying for the building permit and to calling the City of Huntsville to obtain required inspections.

### D.   Meadow Winds Property Renovations

The Plaintiff paid the Defendant $47,255.00 for work performed in four installments on the following dates: (i) $17,000.00 on April 28, 2016; (ii) $14,550.00 on May 6, 2016; (iii) $8,675.00 on May 12, 2016; (iv) $7,000.00 on June 30, 2016, for a total of $47,225.[28]   The

---

[26]     Plaintiff's Exhibit 25.
[27]     Complaint for Determination of Dischargeability and Objecting to Debtor's Discharge Pursuant to Section 523 and 727 of the Bankruptcy Code, ECF No. 1.
[28]     Defendant's Exhibit 28.

11

Plaintiff relied on the Plaintiff's Agent to determine whether the payments were owed pursuant to the terms of the amended draw schedule prior to making each payment.

On June 13, 2016, the Plaintiff's Agent emailed the Plaintiff with a punch list of exterior renovations which needed to be completed: (i) Gutters; (ii) Clean all windows inside and out and window seals; and (iii) Paint shutters with another coat of paint.[29] On the same day, the Plaintiff's Agent sent the Plaintiff another email, adding "[n]ew glass for garage . . ." to the punch list.[30]

On June 21, 2016, the City of Huntsville Inspection Department inspected the Property and discovered that work outside the scope of the building permit obtained by Michael had been performed and that additional permits for plumbing and electrical work were needed.[31]   The Job Inspection Report states that the renovation was "[n]ot a back to back service, need permits for other work performed, this includes plumbing and mechanical. License holder will need to meet me on the job."[32]

On June 24, 2016, three days after the Property failed inspection, Delacruz, the Defendant's assistant, emailed the Plaintiff requesting a $5,000 draw to cover the Defendant's labor expenses for the week, stating in part, "We should be done with everything tomorrow. Also, I, know there was a problem with Utilities, we had no control over it.   We tried to put as much effort as possible but when inconveniences come up that we have no control over, plans don't go as we hope and plan for them to go . . . ."[33]

---

[29]     Defendant's Exhibit 45.
[30]     *Id.*
[31]     Plaintiff's Exhibit 41.
[32]     *Id.*
[33]     Plaintiff's Exhibit 35.

On June 28, 2016, the City of Huntsville inspected and failed the Property a second time.[34] The Job Inspection Report states that an electrical permit was needed for "hvac/light switch and 11p plug" and that "all ducts need insulated/supported, package unit needs clearance to house, needs rodent proof, t-stat wire in sealtite. Need a walkway in attic, service platform in front of unit, light and plus in attic. condensate drain needs insulated."[35]

On June 29, 2016, Delacruz emailed the Plaintiff requesting $7,000.00. Delacruz represented that the Defendant had completed the unfinished items and that the Plaintiff's Agent had inspected the Property to make sure everything was finished.[36] Thereafter, an exchange of emails ensued between the Plaintiff, the Plaintiff's Agent, and Delacruz regarding whether or not the job was complete during which the Plaintiff instructed the Plaintiff's Agent to inspect the Property and to send photographic evidence of completion.[37]

On June 30, 2016, the Plaintiff wired $7,000.00 to the Defendant.[38] The Defendant testified that he was not aware that the Property had failed final inspection when he received this payment because Michael was in charge of obtaining the inspections from the City of Huntsville.

Thereafter, on July 6, 2016, the Defendant returned to the Property after the Fourth of July holiday and discovered that the glass on the electric meter was broken and notified the Plaintiff's Agent. The Defendant took no further action with respect to broken meter, explaining that he did

---

[34] Plaintiff's Exhibit 41.
[35] *Id.*
[36] Plaintiff's Exhibit 37.
[37] Plaintiff's Exhibit 38
[38] Plaintiff's Exhibit 39.

13

not take a picture of the broken meter and did not report the damage to his insurance company because he was not responsible for the meter.

On July 7, 2016, Delacruz emailed Paniccia, asking whether the Plaintiff needed Cruz Electric to perform the electrical work at the house to which Paniccia replied, "have Cruz cancel the permit and provide notice . . . when done."[39] The following day, Delacruz responded, stating "[w]e will with no problem but we need to collect the last payment which is owed to us before we cancel the permit because the interior work is complete and all inspections have been passed."[40]

On July 15, 2016, a City of Huntsville Inspector, Anita Manley (hereinafter "Manley") inspected the Property after she was notified by the Huntsville Utility Department that electrical work had been performed at the Property without a permit. Manley put a hold on the project upon discovering that electrical work had been performed by an unlicensed electrician.[41] It is undisputed that the Defendant was present on the jobsite when Manley inspected the Property. It is further undisputed that the Defendant admitted to Manley that he had performed the electrical work in the interior of the residence.

Manley further testified that she saw the broken electrical meter lying on the ground and that the Defendant admitted to her that he had disturbed the meter. The Defendant denies that he told Manley that he disturbed the meter and insists that he had finished the exterior renovations before the meter was broken over the Fourth of July holiday. While it is undisputed that the Defendant performed electrical work inside the Property without being properly licensed, the

---

[39] Plaintiff's Exhibit 40.
[40] *Id.*
[41] Plaintiff's Exhibit 42.

Case 19-80063-CRJ    Doc 148    Filed 03/30/21    Entered 03/30/21 08:55:56    Desc Main
Document    Page 14 of 32

Defendant denies that either he or his employees removed the electric meter from the exterior of the home in the course of replacing the exterior siding as the Plaintiff contends. According to the Defendant, his crew trimmed around the original electrical meter when they replaced the exterior siding.

The Defendant further asserts that his crew finished replacing the exterior siding almost two months before the electrical service to the home was disrupted. On May 6, 2016, the Plaintiff paid the Defendant the second draw which was to be paid upon completion of the exterior work. During the trial, the Defendant submitted a photograph date stamped June 10, 2016 into evidence, which appears to reflect that the exterior siding had been completely replaced at least one month before the meter was damaged.[42] While the Defendant testified that he does not know who had damaged the electric meter, he opined that the Plaintiff had other subcontractors working at the Property when the meter was damaged.

On July 25, 2016, Manley issued a citation to the Defendant for performing unlicensed electrical work at the Property.[43] It is undisputed that the Defendant installed light switches, can lights, and ceiling fans without a permit. The Defendant was charged with performing electrical work inside Huntsville City limits without a license. On August 30, 2016, the Defendant plead guilty to performing electrical work in Huntsville City limits and paid a small fine. On September 27, 2016, the Alabama Board of Electrical Contractors issued a letter to the Defendant stating that it had received a complaint that he was performing unlicensed electrical work in violation of

---

[42]     Defendant's Exhibit 44.
[43]     Plaintiff's Exhibit 43.

15

Alabama law.[44]  Manley also testified that she charged the Defendant with unlicensed contracting in 2012 in the City of Huntsville on an unrelated project for which the Defendant plead guilty.

While it is undisputed that the Defendant performed unlicensed electrical work in the interior of the home, replacing ceiling fans, installing can lights, and electrical outlets, there is no competent evidence establishing how the electrical service to the exterior of the home was disrupted.    Once the electrical service to the home was disrupted, the City of Huntsville required the entire electrical service to the home to brought up to Code and the Plaintiff made demand upon the Defendant and Michael to do so at their own expense.

After Michael and the Defendant refused to perform the additional work at their own expense, the Plaintiff hired Steele Builders, LLC on September 27, 2016 to bring the Property up to Code and to complete the renovations for an additional $24,100.[45]    On September 29, 2016, Steele Builders, LLC obtained a building permit to bring the electrical, mechanical, and plumbing up to Code, repair drywall, install appliances, and clean the property.[46]   On November 3, 2016, the City of Huntsville issued a Certification of Occupancy for the Property.[47]

The Defendant argues that the amount charged by Steele Builders, LLC to bring the Property up to Code was excessive.   The managing member of Steele Builders, LLC, Josh Steele (hereinafter "Steele"), explained that there are always additional risks involved when completing work began by another, especially once a jobsite has failed inspection because city inspectors are naturally more vigilant once a jobsite has been flagged. Steele further explained that he met with

---

[44]        Plaintiff's Exhibit 47.
[45]        Plaintiff's Exhibit 49.
[46]        Plaintiff's Exhibit 50.
[47]        Plaintiff's Exhibit 51.

the City of Huntsville inspectors at the jobsite to determine the extent of work required to bring the Property up to Code before he gave the Plaintiff a fixed-price quote to complete the renovations. After meeting with the inspectors, Steele determined that there was a considerable amount of remaining work required to bring the house up to Code. The circuit breaker had to be replaced because there were thirty-three circuits on the thirty-circuit panel, drywall had to be removed to run new supply lines from the meter to the circuit panel, the ceiling fans had to be braced, GFI outlets and smoke detectors had to be installed, bullnose tile was missing, and a lot of touch-up painting was required. Steele further explained that he factored in additional costs between 25% to 30% to cover worst case contingencies and to complete the work as soon as possible. Steele initially quoted the Plaintiff $12,500 just to bring the electrical up to Code but agreed to reduce the price to $11,500.[48] The quote also included $2,000 for new appliances and $4,000 for HVAC which were not included in the Defendant's Contract, reducing the total cost to bring the home up to Code to $18,100.[49]

The Defendant called Jeremiah Anderson (hereinafter "Anderson"), the Vice President of A&J Electric, as a witness to testify regarding the reasonableness of the amount charged for the work performed by Steele. Anderson testified that Steele subcontracted all of the electrical work to Knight Electric for $8,000 which amount Anderson found to be reasonable and in keeping with normal charges in the Huntsville area, but explained that he did not believe the $3,500 up-charge for electrical was reasonable and in-keeping with standard amounts charged by general contractors in the area. Anderson testified that he is familiar with City Ordinances that require homes to be

---

[48]     Defendant's Exhibit 18.
[49]     *Id.*

upgraded to Code if service to the home is disrupted.  He explained that the electrical system at the Property would not have needed to be brought up to Code had the power to the home not been disrupted because the home was built prior to the National Electric Code of 2002.

On April 7, 2017, the Plaintiff sold the Property for $150,62.00 for a profit of approximately $11,000.00. The Plaintiff originally listed the property for sale at $180,000.00 and then lowered the price to $164,00.00 after hiring a new realtor.  Paniccia testified that he would not have purchased the property had he known that it would sell for $150,000.00. The Plaintiff has not invested in another property in Alabama since purchasing the Meadow Winds Property.

## CONCLUSIONS OF LAW

A fundamental objective of the Bankruptcy Code "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort."[50]  To ensure that the "'honest but unfortunate debtor' is afforded a fresh start," the Eleventh Circuit "generally construes the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor[.]'"[51]  The Eleventh Circuit has explained, however, that this general policy "applies to honest debtors only," and stated that the "malefic debtor may not hoist the Bankruptcy Code as protection from the full consequences of fraudulent conduct."[52]  This Court is mindful of the fundamental objectives of

---

[50]  *Beem v. Ferguson (In re Ferguson),* 713 Fed. Appx. 974, 977 (11th Cir. 2018)(quoting *In re St. Laurent,* 991 F.2d 672, 680 (11th Cir. 1993)).
[51]  *Griffith v. United States of America (In re Griffith)*, 206 F.3d 1389, 1394 (11th Cir. 2000)(quoting *In re Miller,* 39 F.3d 301, 304 (11th Cir. 1994)).
[52]  *St. Laurent, II v. Ambrose (In re St. Laurent, II),* 991 F.2d 672, 680 (11th Cir. 1993).

18

the Bankruptcy Code and the delicate balance the statutory exceptions to discharge are intended to achieve. The Court has carefully considered the evidence adduced at trial and the credibility of the witnesses in making this decision while keeping this intended balance in mind.

## A. 11 U.S.C. § 523(a)(2)(A)

In this case, the Plaintiff seeks a judgment against the Defendant in the amount of $21,247.67, plus costs, and an order excepting the debt from discharge pursuant to § 523(a)(2)(A) of the Bankruptcy Code which states as follows:

(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –
. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.][53]

To prevail on the question of dischargeability under 11 U.S.C. § 523(a)(2)(A) in the Eleventh Circuit, a creditor must show that "(1) the debtor made a false representation with the intention of deceiving the creditor, (2) the creditor relied on the false representation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the false representation."[54] Creditors must prove each element under § 523(a)(2)(A) by a preponderance of the evidence.[55] Failure to prove a single element requires a finding of dischargeability.

---

[53] 11 U.S.C. § 523(a)(2)(A).

[54] *Taylor v. Wood (In re Wood)*, 245 Fed. Appx. 916, 917 (11th Cir. 2007)(citing *Securities and Exchange Commission v. Bilzerian (In re Bilzerian),* 153 F.3d 1278, 1281 (11th Cir. 1998)); See also *Fuller v. Johannessen (In re Johannessen),* 76 F.3d 347 (11th Cir. 1996).

[55] *Grogan v. Garner,* 498 U.S. 279 (1991).

19

Here, the Plaintiff asserts that the Defendant made false representations that he was a licensed contractor and that he would obtain the necessary permits to complete the renovation of the Property; that the Defendant was at best acting recklessly when he falsely represented that he was licensed and could obtain the necessary permits; that the Plaintiff relied upon the Defendant's false representations and Plaintiff's reliance was justified given that home building is a restricted practice in the State of Alabama; and that the Plaintiff sustained a financial loss as a direct and proximate result of the Defendant's false representations.[56] Specifically, with respect to the issue of damages and proximate cause, the Plaintiff argues that "[b]ecause Defendant performed illegal electrical work beyond the scope of what was stated in the [building] permit, the Plaintiff was required to upgrade a substantial portion of the electrical system from the meter outside the house to the panel inside at a great additional expense among other expenses as a result of Defendant being issued a stop work order."[57] The preponderance of the evidence produced by the Plaintiff did not prove these assertions.

### (i)     False Pretenses and False Representations Made with Intent to Deceive

"A false representation typically requires 'an expressed misrepresentation by a debtor."[58] The Eleventh Circuit has explained "that reckless disregard for the truth or falsity of a statement constitutes a 'false representation' under § 523(a)(2)(A) of the Bankruptcy Code.'"[59]

---

[56]     Post-Trial Brief in Support of Plaintiff, ECF No. 146.

[57]     *Id.* at ¶ 28.

[58]     *Johnson v. Antoine (In re Johnson),* 2017 WL 1839159 *8 (Bankr. N.D. Ala. 2017)(Crawford, J.).

[59]     *Birmingham Trust Nat'l Bank v. Case (In re Case)*, 755 F.2d 1474, 1476 (11th Cir. 1985), superseded on other grounds, Pub. L. No.98-353, 98 Stat. 333 (1984).

In contrast, false pretenses generally involve "an implied misrepresentation that is meant to create and foster a false impression."[60] For purposes of § 523(a)(2)(A), the Eleventh Circuit has explained that the term 'false pretenses' is expansive, stating:

> The concept of false pretenses is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses may be implied from conduct or may consists of any acts, work, symbol, or token calculated and intended to deceive . . . It is a series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor . . . . Silence or concealment as to a material fact can constitute false pretenses.[61]

Additionally, the term "contemplates a misrepresentation that is intentional or made with reckless indifference to the truth."[62] Furthermore, silence as to material facts can constitute false representations where the debtor had a duty to disclose, but failed do so "motivated by an intent to deceive."[63] "A determination of fraudulent intent is an issue of fact and 'depends largely upon an assessment of the credibility and demeanor of the debtor . . . .'"[64] An intent to deceive may be inferred from a reckless disregard for the truth or the falsity of a statement combined with the magnitude of the resulting misrepresentation.[65] Intent is generally inferred from a totality of the circumstances.[66]

---

[60] *Maljamar Fuel Stop, LLC v. Sherman (In re Sherman)*, 2018 WL 3617660 *5 (Bankr. D. N.M. 2018); *See also Duggan v. Gannon (In re Gannon)*, 598 B.R. 72, 83 (Bankr. D. Mass. 2019).

[61] *In re Wood*, 245 Fed. Appx. at 918 (quoting *In re Gilmore*, 221 B.R. 864 (Bankr. N.D. Ala. 1998)).

[62] *Id.*

[63] *Nielson v. Aman (In re Aman)*, 492 B.R. 550 (Bankr. M.D. Fla. 2010)(failure to disclose junior mortgage lien not listed among encumbrances to be satisfied at closing constituted a false representation).

[64] *Id.* at 564.

[65] *Ward v. Decret (In re Decret)*, 2017 WL 4097813 *2 (Bankr. Cal. 2017).

[66] *Coluccio v. Sevastakis (In re Sevastakis)*, 591 B.R. 197, 205 (Bankr. D. N. J. 2018).

21

In cases involving unlicensed contractors or faulty construction, bankruptcy courts "have generally recognized 'two ways to establish misrepresentations or fraud under section 523(a)(2)(A): (1) to show that the contractor executed the contract never intending to comply with its terms; or (2) to demonstrate that the contractor intentionally misrepresented a material fact or qualification when soliciting the work."[67]  In this case, the Defendant had completed most of the work required under the Contract and the Plaintiff had paid for the work performed before the electrical service to the home was disrupted.  While it is undisputed that a portion of the renovations performed by the Defendant had to be torn out after the electrical service to the house was disrupted and the City of Huntsville required the Plaintiff to bring the house up to Code, it was not proven that the Defendant executed the Contract never intending to comply with its terms given the amount of work performed pursuant to the terms of the Contract. Thus, the question before this Court in this case is whether the evidence demonstrates that the Defendant misrepresented, either intentionally or with reckless indifference for the truth, a material fact or qualification when soliciting the work or that the Defendant concealed material facts from the Plaintiff with intent to deceive.

Courts have held that "general representations about expected work performance or poor quality of work (without something more) merely give rise to a breach of contract action and will not suffice to constitute misrepresentation under § 523(a)(2)(A)."[68] Further, a debt is not excepted from discharge under § 523(a)(2)(A) "simply because the contractor was unlicensed at the time

---

[67]    *Id.*

[68]    *Id.*(explaining that shoddy workmanship is insufficient to establish a claim under § 523(a)(2)(A)); *See also In re Decret*, 2017 WL 4097813 at *2(failure to fulfill obligations under a construction contract, by itself, does not establish a false representation).

22

the construction agreement was executed."[69]   For instance, courts have held that state court disgorgement orders entered against unlicensed contractors that are premised solely on a rule of law which requires no showing of fraud or actual harm do not give rise to a nondischargeable claim under § 523(a)(2)(A).[70]

However, "when a contractor positively misstates that he has the requisite license to perform home repairs, the false statement is a misrepresentation" for purpose of § 523(a)(2)(A)" because "a contractor has a duty to disclose his lack of a license during negotiations."[71] "In such cases, the creditor generally must show 'that there was an intentional misrepresentation as to a material fact or qualification when soliciting or obtaining the work."[72] For example, in the case of *Coluccio v. Sevastakis (In re Sevastakis)*, 591 B.R. 197 (Bankr. D. N.J. 2018), the bankruptcy court found that the debtor made significant misrepresentations when he entered into a construction contract with homeowners by falsely representing his qualifications to prepare plans for the renovations and by failing to inform the homeowners that they needed to hire a licensed architect to draw plans for the project. He also purposefully misled the city when applying for a permit by forging the homeowner's signature on the application and in misrepresenting who had prepared drawings on the permit application.   Alternatively, in this present case, the Defendant argues that

---

[69]      *In re Decret*, 2017 WL 4097813 *2 (citing *Ghomeshi v. Sabban* (*In re Sabban*), 600 F.3d 1219 (9th Cir. 2009)).

[70]      *See In re Sabban*, 600 F.3d 1219(state court award against unlicensed contractor pursuant to California's Business and Professions Code for compensation paid by homeowner was not excepted from discharge as a debt for money obtained by fraud); *Willcox v. Carpenter (In re Carpenter)*, 453 B.R. 1 (Bankr. D.C. 2011)(disgorgement order not excepted from discharge where reliance upon false representation as not proximate cause of loss).

[71]      *Vaks v. Grenier (In re Grenier)*, 2009 WL 76335 *9 (Bankr. D. Mass. 2009).

[72]      *In re Sherman*, 2018 WL 3617660 at *5.

23

he fulfilled his duty to disclose that he is not licensed as a home builder by informing the Plaintiff's Agent that he intended to enter into a joint venture with Michael to fulfill the terms of the Contract.

Many courts have also excepted debts from discharge under § 523(a)(2)(A) in cases involving unlicensed contractors where the debtor has engaged in "a series of events, when considered collectively, that create a contrived and misleading understanding of [the] transaction" which induced the creditor to enter into the contract and "extend money or property to the debtor."[73] For instance, in the case of *Vaks v. Grenier (In Grenier),* 2009 WL 763352 (Bankr. D. Mass 2009), the bankruptcy court found that the debtor made false representations with intent to deceive where the homeowners conditioned the debtor's employment upon his affirmative representation that he held a valid registration as a home improvement contractor, which he falsely affirmed. The debtor also failed to pay for materials and services rendered in connection with the contract and abandoned the project. Similarly, in the case of *Maljamar Fuel Stop, LLC v. Sherman (Sherman),* 2018 WL 3617660 (Bankr. D. N.M. 2018), the debtor not only held himself out to be a licensed contractor, but also diverted more than $146,000 in funds for the payment of his personal debts which were intended for the payment of subcontractors.

In this present case, there are no allegations that the Defendant diverted any funds paid by the Plaintiff for his personal use nor that the Defendant failed to pay for materials used in the project. Rather, the Plaintiff argues that the Defendant falsely represented that he would be responsible for obtaining the necessary permits, inspections, and certificate of occupancy. The Defendant admits that he knew that he could not obtain a building permit for the renovations

---

[73]     *In re Grenier*, 2009 WL 76335 at *10.

without enlisting the help of a licensed contractor but asserts that he explained to the Plaintiff's Agent that he would have to enter into a joint venture with Michael to obtain the required permits and certificate of occupancy before he entered into the Contract. Thereafter, Michael obtained a building permit for the renovations and was listed as the contractor on the permit which was posted at the jobsite. While Paniccia testified that he would not have hired the Defendant had he known that he was not a general contractor, he further admitted that he merely assumed that the Plaintiff's Agent had recommended a general contractor, but she never actually told him that the Defendant was a general contractor.

Although Cunningham testified that the agreement between the Defendant and Michael violated state law prohibiting a licensed home builder from "loaning" his license to another, the Defendant testified that the Plaintiff's Agent knew that the Defendant could not obtain the building permit on his own. While it is possible that the Plaintiff's Agent may have refuted the Defendant's testimony had she testified, the Court found the Defendant's testimony to be credible. To be clear, the joint venture between Michael and the Defendant violated state law, the Defendant performed unlicensed electrical work in the home, and both were disciplined accordingly. However, it is undisputed that the Plaintiff's Agent asked to see the Defendant's license before he started the job and that he showed her his subcontractor's license, not a home builder's license nor a general contractor's license. There is no evidence that the Plaintiff's Agent asked to see anything other than his "license." Given the language barrier and the Defendant's candor that he showed the Plaintiff's Agent his subcontractor's license, the Court found the Defendant's testimony to be credible. Without contradictory testimony from the Plaintiff's Agent upon whom the Plaintiff relied on to both recommend the Defendant and to oversee the renovations, the Court finds that

25

the Plaintiff failed to prove that the Defendant made a direct, false representation that he was a licensed home builder or general contractor, nor that he engaged in a series of transactions with reckless disregard for the truth.

While the Defendant failed to obtain the required certificate of occupancy, mere breach of a construction contract does not establish false pretenses, false representation, or actual fraud for purposes of § 523(a)(2)(A).[74] The Plaintiff does not allege that the Defendant diverted any of the proceeds paid by the Plaintiff in this case nor failed to pay for materials. While the Plaintiff argues that much of the work performed by the Defendant had to be torn out after electrical service to the home was disrupted and the City of Huntsville required the house to be brought up to Code, there was no credible evidence establishing how the electrical service to the home was disrupted. Although Manley testified that the Defendant admitted to her that he disrupted the electrical service, the Court did not find her testimony regarding the alleged admission to be credible given that no interpreter was involved in the conversation and the Defendant has demonstrated a lack of proficiency in speaking and understanding English. Based upon the testimony, it appears possible that Manley asked the Defendant a question to which he responded affirmatively without truly understanding what she had asked.   In addition, the documentary evidence presented established that the Plaintiff paid the Defendant the third draw due upon completion of the exterior work which the Plaintiff's Relator oversaw and approved.   Finally, the pictures submitted into evidence also appear to show that the exterior siding had been replaced at least one month before the electrical service to the home was disrupted.

---

[74]     *In re Decret,* 2017 WL 4097813 at *2.

Based upon the totality of the circumstances of the evidence presented, the Court concludes that the Plaintiff failed to establish, by a preponderance of the evidence, that the Defendant misrepresented, either intentionally or with reckless indifference for the truth, a material fact or qualification when soliciting the work or that the Defendant concealed material facts from the Plaintiff with intent to deceive for purposes of § 523(a)(2)(A).

**(ii)    Justifiable Reliance**

Because the Court finds that the Plaintiff failed to establish by a preponderance of the evidence that the Defendant made a false representation, either intentionally or with reckless indifference for the truth, there can be no justifiable reliance. Nevertheless, the Court finds that the Plaintiff failed to establish that it justifiably relied on any alleged misrepresentation regarding the Defendant's status as a licensed contractor under the circumstances of this case.

In *Field v. Mans*, 516 U.S. 59 (1995), the Supreme Court determined that the applicable standard of reliance that a creditor must establish under § 523(a)(2)(A) is justifiable reliance rather than the rigid standard of reasonable reliance.   "To constitute justifiable reliance, '[t]he plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility.'"[75]

Justifiable reliance does not mean that the Plaintiff's "conduct must conform to the standard of a reasonable man."[76]   Rather, "[j]ustifiable reliance is gauged by an *individual standard* of the plaintiff's own capacity and the knowledge which he has or which may fairly be

---

[75]    *Stewart Title Guaranty Co. v. Roberts-Dude (In re Roberts-Dude)*, 597 Fed. Appx. 615, 617 (11th Cir. 2015)(citing *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998)).
[76]    *Id.*

27

charged against him from the facts within his observation in the light of the individual case."[77] "[I]t is only where, under the circumstances, the facts should be apparent to one of plaintiff's knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."[78]

The Defendant argues that the Plaintiff could not justifiably rely on any supposed representations by the Defendant that he was a licensed general contractor or home builder when a thirty-second search on the Alabama Home Builders Licensure Board Website would have revealed that the only contractor named "Rodriguez" in Alabama is Rodriguez Home Builders, LLC which is located in Rainbow City, Etowah County, Alabama. The Court rejects the specious suggestion by the Defendant that a homeowner must verify an affirmative representation made by contractor regarding the status of the contractor's license to establish justifiable reliance for purposes of § 523(a)(2)(A), unless the homeowner has discovered something which serves as a "red flag" warning that warrants further investigation.

As the Supreme Court held in *Field v. Mans,* a buyer's reliance on a seller's representation that the subject property is free of encumbrances "is justified, even if he could have 'walk[ed] across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage."[79] Further, in the case of *Stewart Title Guaranty v. Denise Roberts-Dude (In re Denise Roberts Dude),* 597 Fed. Appx. 615 (11th Cir. 2015), the Eleventh Circuit held

---

[77] *Sears v. United States (In re Sears),* 533 Fed. Appx. 941, 945 (11th Cir. 2013)(quoting *Vann v. City Bank & Trust Co. (In re Vann)*, 67 F.2d 277 (11th Cir. 1995)).

[78] *Id.*

[79] *Field v. Mans*, 516 U.S. 59, 70 (1995).

28

that a title insurance company justifiably relied on an individual Chapter 11 debtor's false representations, in connection with a real estate purchase transaction for which it issued a title policy, that there were no unpaid judgment liens on the property. Before issuing the title insurance policy, the title company performed three searches in order to find any unknown liens or encumbrances but failed to discover a deed of trust that was improperly recorded. The Eleventh Circuit explained that it could not say that the title company's title search "was so utterly unreasonable, in the light of the information apparent to [it], that the law may properly say that [its] loss [was its] own responsibility," despite the title company's experience in performing title searches.[80] Moreover, even if the title company should have performed a more thorough search, "mere negligence is insufficient to protect the fraudulent defendant."[81]

Rather, "[w]hen determining if a plaintiff's reliance was justifiable courts consider whether there were any 'red flags' in the transaction that would have put the creditor on notice that further investigation was warranted."[82] Here, the Court finds that such red flags were present which should have prompted the Plaintiff to investigate further. It is undisputed that the Plaintiff had to provide the Defendant with a form construction contract which general contractors usually already have because the one-page proposal submitted by the Defendant did not contain the type of details that Paniccia was accustomed to seeing in construction contracts presented by other general contractors which the Plaintiff had hired on other numerous occasions. Further, when the Defendant executed the Contract, he left the line under his signature titled "Contractor's License"

---

[80]     *In re Roberts-Dude,* 597 Fed. Appx. at 619.
[81]     *Id.*
[82]     *Duggan v. Gannon (In re Gannon)*, 598 B.R. 72, 86 (Bankr. D. Mass 2019).

29

blank. It is also undisputed that the building permit posted at the jobsite clearly listed Michael Construction Company as the Contractor for the Property, that the Plaintiff's Relator came to the jobsite on a daily basis to oversee the renovations, and that she would have seen the building permit listing Michael Construction Company as the Contractor. Accordingly, the Court finds that there were sufficient red flags which should have prompted the Plaintiff's Agent and/or the Plaintiff to investigate further if the Defendant was a licensed home builder or general contractor which negates a finding of justifiable reliance.

**(iii)** **Proximate Cause or Damage Sustained as a Result of the False Representation**

"For a debt to be nondischargeable under § 523(a)(2)(A), a creditor must show that it 'sustained a loss as a result of the misrepresentation.'"[83] The Plaintiff argues that "[b]ecause Defendant performed illegal electrical work beyond the scope of what was stated in the [building] permit, the Plaintiff was required to upgrade a substantial portion of the electrical system from the meter outside the house to the panel inside at a great additional expense among other expenses as a result of Defendant being issued a stop work order."[84] The Defendant counters that he substantially completed all of the work required under the Contract before the electrical service to the home was disrupted. The Defendant further argues that the alleged false representation upon which the Plaintiff relies, that the Defendant agreed to perform work knowing that he could not obtain the required permits and certificate of occupancy without entering into a joint venture with

---

[83] *In re Sears,* 533 Fed. Appx. at 947.
[84] Post-Trial Brief in Support of Plaintiff, ECF No. 146, ¶ 28.

Michael, was not the proximate cause of the damage incurred by the Plaintiff when the home's electrical service was disrupted.

Given the age of the residence which was built prior to 2002, the City of Huntsville regulations did not require the electrical service to the home to be brought up to Code. However, once the electrical service was disrupted and the house was flagged, witnesses testified that the house had to be brought up to Code. As the Court explained above, the payments made by the Plaintiff clearly show that the Defendant had substantially completed the renovations contemplated by the Contract, that the Plaintiff's Agent verified that the work was completed before the Plaintiff made each payment, and that the Defendant had completed the exterior renovations before the electrical service to the home was disrupted. The Court further determined that the Plaintiff failed to prove how the electrical service to the home was disrupted. The Defendant testified that he trimmed around the original electrical meter when replacing the siding and the pictures offered into evidence revealed that the exterior siding had been completed at least one month before electrical service to the home was disrupted. The Court found the Defendant's testimony, when corroborated by the Plaintiff's payments and the photographic evidence, to be credible. Accordingly, the Court finds that the Plaintiff failed to establish by a preponderance of the evidence for purposes of § 523(a)(2)(A) that the alleged false representations proximately caused the damage or additional cost incurred by the Plaintiff to bring the electrical system at the Property up to Code.

### B. Conclusion

Based upon the findings and conclusions set forth above, the Court finds that the Plaintiff failed to establish by a preponderance of the evidence the required elements to except its claim

31

against the Defendant from discharge pursuant to § 523(a)(2)(A) as a debt for money obtained by false pretenses, a false representation, or actual fraud. While the Defendant failed to obtain certain permits and the certificate of occupancy as required by the Contract, mere breach of a construction contract does not establish false pretenses, false representation, or actual fraud for purposes of § 523(a)(2)(A). Accordingly, the relief requested by the Plaintiff seeking a nondischargeable judgment for the costs incurred by the Plaintiff to bring the Property up to Code is denied.

A separate judgment will be entered consistent with this Memorandum Opinion.

IT IS SO ORDERED.

Dated this the 30th day of March, 2021.

/s/ Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge

Case 19-80063-CRJ    Doc 148    Filed 03/30/21    Entered 03/30/21 08:55:56    Desc Main
Document      Page 32 of 32